UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

ISAAC JOSHUA

CRIMINAL ACTION

NO. 11-42-BAJ-SCR

**RULING ON MOTION TO SUPPRESS**

I.  BACKGROUND

Before the Court is a Motion to Suppress (doc. 12) filed on behalf of Isaac Joshua, defendant in the above-captioned matter. On September 6, 2010, Lieutenant Richard Lee, Officer Bryan Taylor, Corporal Lionel Freeman, and Officer Kyle Hill of the Baton Rouge Police Department ("BRPD") together arrived at the apartment of Frozella Davis ("Ms. Davis") located at 1255 W. Roosevelt Street, in a complex operated by the East Baton Rouge Parish Housing Authority ("Housing Authority").[1] The four officers went to the apartment to investigate whether Ms. Davis was keeping a dog in the apartment without having paid a pet deposit, in violation of Housing Authority policy. The officers knocked on the door of the apartment and when it was opened by Ms. Davis, a small pit bull puppy came out. The officers asked Ms. Davis for consent to enter the apartment, which she granted.

---

[1] Lieutenant Richard Lee, Corporal Lionel Freeman and Officer Kyle Hill are permanently assigned to the Housing Authority Division of the BRPD. Officer Bryan Taylor, who is assigned to another division of the BRPD, works extra duty with the Housing Division.

1

The defendant was also present in the apartment at the time of the officers' arrival.[2] The defendant, Ms. Davis and the four officers were together in the common living area of the apartment while Lieutenant Lee and Corporal Freeman spoke to Ms. Davis concerning the presence of the dog in the apartment, the policies of the Housing Authority, and the provisions contained in the lease signed by Ms. Davis. Ms. Davis was not issued a citation, nor was any adverse action taken against her because of the presence of the dog in the apartment.

While Lieutenant Lee and Corporal Freemen spoke to Ms. Davis, Officers Taylor and Hill observed a box of 9mm handgun ammunition in plain view on top of a kitchen counter. After Lieutenant Lee and Corporal Freeman concluded addressing Ms. Davis, Officer Taylor and Officer Hill began to question the defendant and Ms. Davis about the ammunition. Suspecting a possible correlation between the ammunition and a homicide for which the defendant's cousin had recently been arrested, Officer Taylor went outside to make a telephone call to the detectives involved in homicide investigation. The telephone call confirmed that the ammunition which the officers located in the apartment was not the same caliber as that used in the homicide. Officer Taylor returned inside of the apartment, where the officers questioned the defendant as to the possible presence of a firearm inside the apartment. After repeatedly denying that there was a weapon in the apartment, the

---

[2] Ms. Davis testified at the suppression hearing that the defendant did not live in the apartment, but that he visited the apartment regularly, and that he had stayed at the apartment overnight on the weekend prior to the incident in question.

defendant eventually told the officers that there was a firearm located in an upstairs bedroom. The officers went upstairs to retrieve the firearm but were unsuccessful in locating it. One of the officers went back downstairs to ask the defendant about the exact location of the gun, and the defendant replied that it was located inside the box spring of a mattress. Once it was located, a computerized search of the weapon's serial number revealed that it had been previously reported to have been stolen. The defendant was arrested for possession of stolen property. A criminal background search revealed that the defendant had been previously convicted of a felony; thus, the defendant was also charged being a convicted felon in possession of a firearm.

The defendant filed the instant motion to suppress seeking suppression of any inculpatory statements made by the defendant to the police officers in response to police questioning, as well as the physical evidence of the firearm. The Government filed an opposition (doc. 15) to the defendant's motion The Court conducted a two-part suppression hearing, during which the Court heard testimony from the four officers, Ms. Davis, and well as Mary White, the manager of the apartment complex at the time of the encounter. At the conclusion of the hearing, the Court took the matter under advisement. Both parties have filed post-hearing briefs (docs. 30 and 31) as directed by the Court.

## II. LAW AND ARGUMENT

Two issues are presented by the defendant's motion to suppress. The first is

3

whether the defendant was subjected to a custodial interrogation by the BRPD police officers while in Ms. Davis' apartment. The second issue is whether Ms. Davis gave the police voluntary consent to search for the weapon in the upstairs bedroom of her apartment.

A.     **Custodial Interrogation**

A defendant's Fifth Amendment right against self-incrimination is implicated only when the defendant is subjected to a custodial interrogation. *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005). Statements obtained during a custodial interrogation without the benefit of adequate warnings under *Miranda* are generally inadmissable. *U.S. v. Stevens*, 487 F.3d 232, 241 (5th Cir. 2007), *cert. denied*, 552 U.S. 936, 128 S.Ct. 336, 169 L.Ed.2d 236 (2007).[3]

> The *Miranda* Court first defined "custodial interrogation" to mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. The meaning of custody has been refined so the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest. The Supreme Court has also explained that the only relevant inquiry is how a reasonable man in the suspect's position would have understood the situation. A suspect is therefore in custody for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law

---

[3] See also, *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) ("It is axiomatic that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during custodial interrogation without a prior warning.")

4

associates with formal arrest.

*U.S. v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988), *cert. denied*, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325.

In the present case, it is undisputed that the defendant was not formally arrested until some time after the gun was discovered inside the apartment. Therefore, the Court must determine whether the statements given by the defendant to the police prior to being arrested were made under circumstances which constituted a restraint on the defendant's freedom of movement to the degree which is associated with formal arrest. In this regard, the Supreme Court has instructed that "[t]wo discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457 (1995). The Fifth Circuit has further advised that "[t]he reasonable person through whom we view the situation must be neutral to the environment and to the purposes of the investigation–that is neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *U.S. v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988). Moreover, "the subjective intent of neither the officer nor the defendant is relevant to the custody determination." *U.S. v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010).

The Government submits that the defendant was not in custody while

5

questioned by the police officers in Ms. Davis' apartment, and therefore, it was not necessary for the officers to give the defendant Miranda warnings. As to the circumstances surrounding the interrogation, the Government sets forth several factors in support of its position. Specifically, the Government avers that the defendant was not placed in handcuffs, that he was not restricted in his freedom of movement nor told where to stand or sit during the questioning, was not instructed that he could not leave the apartment, and that the officers did not make physical contact with the defendant during the questioning, or brandish their weapons. The Government further submits that the officers did not know that the defendant would be present in the apartment when they arrived, the officers did not know the defendant's criminal history prior to placing him under arrest, and that none of the officers suspected the defendant of any crime.[4]

In support of the motion to suppress, the defendant argues that he was subjected to a custodial interrogation without the benefit of *Miranda* warnings, and therefore, the statements which he gave to the BRPD officers must be suppressed. Ms. Davis testified that she and the defendant were told that Ms. Davis would be evicted from the apartment if the defendant failed to cooperate with the officers. The defendant further submits that he was subjected to rapid-fire questioning for an extended period of time, ranging anywhere from 15 minutes to an hour, based on the

---

[4] The evidence presented by the Government failed to reveal the reason why it was necessary for four uniformed BRPD police officers to respond to a possible lease infraction involving a possible unlawful pet.

testimony from the officers and Ms. Davis presented at the hearing. Ms. Davis also testified that the officers brought up the defendant's past criminal history, that the defendant was questioned about an unrelated murder investigation, and that the police officers threatened to bring a search dog into the apartment if the defendant did not tell the officers where a gun was located. The defendant further submits testimony from a previous state court evidence hearing, during which Officer Taylor testified that he told the defendant that his cooperation was mandated.[5]

Based upon the testimony and evidence received at the suppression hearing and the applicable law, the Court concludes that the circumstances under which the defendant was questioned by the BRPD officers constituted a custodial interrogation. Because the defendant responded to the police-initiated questioning by making inculpatory statements prior to being advised of his *Miranda* rights, the statements of the defendant must be suppressed.

In evaluating the credibility of the testimony presented at the suppression hearing, the Court notes that significant portions of testimony were inconsistent, beginning with the complaint which initially prompted the officers to visit Ms. Davis' apartment. Officer Taylor, Officer Hill and Corporal Freeman each testified that Lieutenant Lee had received a complaint concerning the presence of a dog in Ms. Davis' apartment, but none of the three officers indicated having any personal

---

[5] The defendant submits as Exhibit D-1 a transcript of a preliminary examination held on January 31, 2011 before the 19th Judicial District Court, Parish of East Baton Rouge, State of Louisiana in the matter of "State of Louisiana v. Isaac Joshua," Docket Number 10-10-0469.

7

knowledge about the origin of the complaint. Lieutenant Lee testified that he received the complaint from the manager of the apartment complex, Ms. White. Lieutenant Lee further testified that he had confirmed with Ms. White that Ms. Davis had not a paid a pet deposit to allow her to keep an animal on the premises. In stark contrast to the testimony of Lieutenant Lee, Ms. White testified that she was not aware of any complaints having been received about Ms. Davis keeping the dog in the apartment, that she did not contact Lieutenant Lee to advise him of any pet violations at Ms. Davis' apartment, nor confer with him in any way about the matter prior to the police encounter.[6]

The Court also received conflicting testimony from the officers and Ms. Davis as to the length of the time that the officers remained in Ms. Davis' apartment. Officer Taylor estimated that the total length of encounter was 20 to 25 minutes. Similarly, Corporal Freeman estimated the time period as ranging from 15 to 20 minutes. Ms. Davis, however, testified that the officers remained at the apartment for 45 minutes to an hour. Regardless of the actual length of the time that the police remained in the apartment, on cross-examination, Lieutenant Lee testified that the length of time that the officers spent in speaking to Ms. Davis about the dog was much shorter than the period of time that they questioned the defendant about the ammunition and the possible presence of a gun. The incommensurate amount of

---

[6] Officer Taylor also testified that none of the officers called the management office to confirm whether Ms. Davis had paid a pet deposit.

8

time which the police spent addressing the matter for which they were allegedly dispatched leads the Court to conclude that the pet deposit investigation was merely a pretext for the more serious search for evidence of a homicide.

The testimony at the suppression hearing was again inconsistent as to whether the police used known information regarding the defendant's prior criminal background in order to elicit a response to their questioning. The Government maintains that the officers were unaware of the defendant's past convictions when they questioned the defendant about the ammunition and gun. Ms. Davis testified that officers recited the defendant's criminal record for bribery, recent traffic tickets and misdemeanor offenses. Due to the conflicting testimony, the Court cannot determine with certainty whether the police used the defendant's criminal history in a coercive manner during their questioning. It is clear, however, that the officers had at least some familiarity with the defendant prior to the incident in question. Officer Taylor testified that he had previously encountered the defendant when the defendant's cousin was arrested for being on the apartment complex premises unlawfully, and that Officer Taylor was aware that the defendant's cousin had been recently arrested in connection with a homicide case. Further, Lieutenant Lee testified that the officers had stopped the defendant a few weeks earlier at a nearby location in connection with a separate investigation.

Considering the totality of the circumstances surrounding the defendant's interrogation by the police, Court finds that a reasonable person in the defendant's

9

position would not have felt free to terminate the questioning and to leave the apartment. Four uniformed police officers arrived together at the apartment to investigate what was at most a minor, civil infraction. Once the officers spoke to Ms. Davis about the presence of the dog and the provisions of the lease, it was determined that no further action was necessary, and the purpose for which the officers received consent to enter the apartment was fulfilled. After observing the box of ammunition on the kitchen counter, the officers then embarked on a separate, unrelated line of questioning primarily involving the defendant. While informing the defendant and Ms. Davis that it was not illegal to have ammunition or a firearm in a Housing Authority apartment, the officers simultaneously admonished them concerning their obligation to cooperate with police, and instructed them that failure to cooperate could result in the defendant being banned from the apartment.[7]

The Government's assertion that the officers did not suspect the defendant of being guilty of a crime is seriously undermined by the facts revealed during the course of the suppression hearing. According to the testimony of Ms. Davis and the officers, before making incriminating statements admitting to the possession of a firearm, the defendant repeatedly denied that there was a weapon in the apartment. The officers responded to the defendant's denials by threatening to bring a firearms detecting dog into the apartment. The officers' concern that the ammunition was

---

[7] Ms. Davis further testified that she and the defendant were repeatedly told that failure to cooperate with the police could result in the termination of Ms. Davis' lease. However, each of the four officers testified that Ms. Davis was not threatened with eviction.

possibly evidence related a homicide involving the defendant's cousin was dispelled once it was confirmed that the caliber of the ammunition did not match that which was used in the crime. Nevertheless, the officers resumed questioning the defendant about the presence of a firearm. Officer Taylor testified that during the course of the continued questioning, he felt that defendant was "about to tell the truth," despite the defendant's repeated response that he was not in possession of a gun. Officer Taylor further testified that the nature of the questioning evolved from asking the defendant whether there was a gun in the apartment, to Officer Taylor instructing the defendant, "tell me where the gun is." The Government characterized the circumstances surrounding the questioning as cordial, but Ms. Davis characterized the officers' interrogation as confrontational and unrelenting. The Court finds that a reasonable person in the defendant's position would have felt that his freedom was greatly impaired. Accordingly, the defendant's motion to suppress the statements made in response to the questioning by the BRPD officers is granted.

### B. Consent to Search

The second issue presented by the defendant's motion to suppress is whether Ms. Davis voluntarily consented to the police searching for the gun in the upstairs bedroom of her apartment. In order for consent to a warrantless search to be deemed valid, "the government must prove by a preponderance of the evidence that consent was freely and voluntarily given." *U.S. v. Richard*, 994 F.2d 244, 250 (5th Cir. 1995). The United States Supreme Court has instructed that the question of

11

whether consent to a search was voluntary or the product of duress or coercion, either express or implied, is a question of fact to be determined from the totality of all the circumstances. *Scneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047 (1973). The Fifth Circuit has routinely applied six factors in the course of examining the totality of the circumstances: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Olivier-Becerril*, 861 F.2d 424, 426 (5th Cir. 1988). All of the six factors are relevant to the issue of voluntariness, but no single one is dispositive or controlling. *U.S. v. Freeman*, 482 F.3d 829, 832 (5th Cir. 2007); *U.S v. Estrada*, 459 F.3d 627, 634 (5th Cir. 2006).

The circumstances surrounding the defendant's interrogation are also relevant to the determination of whether Ms. Davis gave voluntary consent to search. It is not alleged that Ms. Davis was ever formally arrested during this encounter with the police. However, Ms. Davis alleged that the police employed coercive procedures by telling her and the defendant that they were required to cooperate with the police investigation, that the defendant could be banned from the premises, and, possibly, that Ms. Davis could be evicted. The Government submits that Ms. Davis was cooperative with the police, as evidenced by her giving the police consent to enter

12

the apartment. The conditions under which Ms. Davis gave consent for the police to enter the apartment (to discuss the presence of the dog) vastly differ from the conditions which developed once the police discovered the box of ammunition. Officer Taylor testified on direct examination that once the questioning about the ammunition ensued, Ms. Davis responded very little, if at all. Ms. Davis' initial consent allowing the officers to enter the apartment to discuss the dog has virtually no bearing on her willingness to cooperate with the officer's investigation of a possible crime involving the defendant. Most significantly, Ms. Davis testified that she did not recall the officers asking for permission to go upstairs to search for the gun. There was no testimony presented which indicates that officers advised Ms. Davis that she had the right to refuse consent to the search.

No evidence was presented at the suppression hearing concerning Ms. Davis' level of education. However, the Court notes that Ms. Davis responded the questions of both the Government and defense counsel with intelligent and coherent answers. Finally, with respect to the sixth factor, Ms. Davis testified that she knew that there was a gun in the apartment, as she saw the defendant bring it in and place it under the mattress.

Taking into consideration the surrounding circumstances, the Court finds that the Government has not shown by a preponderance of the evidence that Ms. Davis voluntarily consented to the search for the gun. Ms. Davis allowed the officers to enter the apartment under conditions wholly unrelated to a criminal investigation.

The focus of the officers' attention shifted quickly from the relative innocuous matter of the puppy and pet deposit to the ammunition, a homicide investigation, and the possibility of a firearm in the apartment. Ms. Davis' subsequent actions do not reveal an intent to cooperate with the police concerning the subsequent line of questioning. By her own admission, Ms. Davis was aware that there was a gun in the apartment, but did not reveal it to the police. Ms. Davis testified that she did not give the officers consent to search for the weapon. Considering the totality of the circumstances, the Court finds Ms. Davis' testimony in this regard to be credible. Accordingly, the defendant's motion to suppress the evidence of the firearm for lack of valid consent to the search is also granted.

### III. ORDER

Accordingly, for the reasons stated herein, the defendant's Motion to Suppress (doc. 12) is hereby **GRANTED**.

Baton Rouge, Louisiana, September 6, 2011

_____
BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA